# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| MICHAEL McGRATH, JILL McGRATH, TIM McGRATH, MARTIN McGRATH, COLIN McGRATH, and CM McGRATH<br><br>Plaintiff,<br><br>v.<br><br>DUNECREST CONDOMINIUM ASSOCIATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  Case No. 3:20-cv-656<br>)<br>)<br>)<br>)<br>)<br>) |

## FIRST AMENDED COMPLAINT AT LAW

Plaintiffs, Michael McGrath, Jill McGrath, Tim McGrath, Martin McGrath, Colin McGrath, and CM McGrath, (a minor) commonly referred to as the ("McGrath Family"), for its Complaint against Defendant, Dunecrest Condominium Association ("Association"), states as follows:

## INTRODUCTION

1. This case is brought under the Fair Housing Act to remedy illegal discrimination against the McGrath family, including their twin sons who are autistic, based upon the Association's failure to issue the necessary paperwork to allow the construction of a small extension to an existing deck, along with a set of stairs to the ground level, to provide a safe secondary exit to the McGrath second floor condominium. It is undisputed that every owner of the Eight (8) unit Association is aware of Tim and Martin McGraths' disability, and the fact Martin is severely autistic with limited communication skills. The McGraths made a simple request for a reasonable accommodation to build an extension to their deck to allow for a staircase to the ground level to

provide a safe exit for Tim, Martin, and their family, in the event of an emergency. Despite receiving a majority vote in favor of the extension, the Association has failed to issue the paperwork to allow building permits to be issued. This case is also brought under the Indiana Condominium Act based upon the Associations failure to follow its Declarations, By-Laws, Rules, and Regulations, which have caused the McGraths to suffer damages.

2. Through the years the Association has allowed deck extensions to three other unit owners by providing all necessary paperwork to start and complete the work. No disabled persons owned or occupied these units at the time of the request for an extension was made and permission to build the extension was given by the Association.

3. The Association has allowed a room addition to be constructed to one of the units in the McGrath building. No disabled persons owned or occupied this unit at the time the request was made and the Association gave permission to build the room addition.

4. Within the last five years, the Association has allowed an extension to a back deck of a unit in another building without requiring plans or bids for the work to be submitted to the Association and never formally approved the extension work. The owner/occupant of this unit is not disabled.

5. The McGraths' unit is the only unit in the Association that is occupied by disabled persons, and the only unit in the Association the Association has refused to issue the necessary paperwork to start and complete their deck extension.

## **PARTIES**

### Plaintiff's McGrath Family

6.     Michael and Jill McGrath have been married for over 28 years, and have five (5) children, Sean (27), Tim (25), Martin (25), Colin (18), and CM (a minor). They are all residents of Cook County, Illinois.

7.     Tim McGrath and Martin McGrath are identical twins, and both were diagnosed as being autistic at the age of 36 months. Through the years, Tim and Martin have undergone thousands of hours of specialized training, therapy and education in an effort to treat their disability. Despite all of the training, therapy and education both have significant deficits, and like most individuals with autism, have difficulty handling changes to their daily routines, have difficulty facing unexpected circumstances, such as an emergency situation.

8.     Although they are identical twins, Tim is higher functioning than Martin, who has severe communication deficits, including limited speech and verbal understanding. Tim and Martin McGrath are both disabled persons under the Fair Housing Act ("FHA").

9.     Dunecrest Condominium Homeowners Association ("Association"), is an Association of eight (8) condominium owners, located in Michigan City, Indiana. The Association is governed by Indiana law and federal law. Pursuant to the Fair Housing Act ("FHA"), the Association is considered a "housing provider" and the FHA requires that housing providers cannot discriminate against protected class members-including disability and familial status- of residents/occupants of the Association.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 42 U.S.C. § 3613(a). This lawsuit is filed pursuant to the Fair Housing Act, 42 U.S.C. 3601.

11. Venue is proper in the Northern District of Indiana under 28 U.S.C § 1391(b), because of substantial part of the events giving rise to Plaintiff's claims occurred within the Northern District of Indiana.

## FACTUAL BACKGROUND

12. The Dunecrest Condominium Association ("Association") was formed under Indiana Lawin 1987, see Indiana Horizontal Property Act, found at Indiana Code IC32-25-1, The Association has recorded the Declarations and By-Laws which govern the Association, along with Amendments thereto. Every owner in the Association is provided a copy of the Declarations and By-Laws when a unit is purchased in the Association.

13. The Dunecrest Condominiums are located in the "Sheridan Beach" area of Michigan City, Indiana, approximately one block from the shores of Lake Michigan.

14. Dunecrest Condominiums consist of two (2) buildings, a North Building and a South Building, facing Lake Avenue.

15. Each building consists of four (4) units, therefore, there are a total of eight (8) units in the Dunecrest Condominium Association.

16. Each building has parking garages on the ground level, two units on the second floor of each building and two units on the third floor of each building. Each building has a main entrance, located in the center of each building which faces Lake Avenue.

17.     Sheridan Beach is located along the Indiana Dunes lakeshore and the Dunecrest Buildings were built at the base of a large sand dune. The North and South buildings were built at an angle in such a way that the front of the buildings are not perpendicular to Lake Avenue, rather the buildings were built at an angle with the buildings slightly angled towards Lake Michigan, to the North.

18.     Based upon the configuration of the North and South buildings, the back portion of the North Building, generally the northwest corner of the North Building, is built directly into the sand dune. Large retaining walls have been built in the area of the northwest corner of the North Building to hold back the sand dune. The other rear corner of the North Building, the southeast corner, is not directly impacted by the retaining wall. The South Building is not directly impacted by the retaining wall as there is a distance of 10 to 30 feet of space between the back of the South Building and the retaining wall.

19.     In 2009, the McGrath Family purchased Unit 121 of the Dunecrest Condominium Association as a weekend getaway destination for their family. Unit 121 is located on the second floor of the North Building, on the north side of the building, closest to the sand dune.

20.     To enter and exit the McGrath's unit, a person has to enter the building's main entrance, walk into the building's common area, climb a flight of stairs, and enter the unit via the front door on the second floor.

21.     The McGrath unit has a back exit located in a bedroom, located in the back of their unit, which leads to a small deck. The deck area is surrounded by the dune retaining walls, walls of the building, and a small opening that leads onto their neighbors' deck.  This small opening is gated, with the gates typically closed, and from time to time locked.

22. The McGrath's back deck area shares a common wall with the common area that contains the staircase used to get to the McGrath's main entrance, as described in paragraph 20.

23. The McGrath unit, like every other unit, has a small deck located directly off of the living room area. The deck is located on the second floor and there are not stairs from the deck to the ground level.

24. Through the years the Association has allowed three (3) unit owners to add onto the decks located off of their living rooms. The deck extensions added another way for those owners to enter/exit their units to the ground level.

25. In order to construct those deck extensions supports had to be placed within the Associations common areas around the buildings. Each extension required 4-5 support beams to be placed in the Associations common area.

26. Each deck extension that has been allowed by the Association are approximately 120 square feet.

27. The deck extensions that have been approved for other unit owners provides a third way to safely and conveniently enter and exit those units, whereas the McGrath family currently has only one safe and convenient way to enter and exit their unit, which may not be available in certain emergencies.

28. For example, if there was an emergency such as a fire or tornado which impacted the main common stairway or common wall located on McGrath's back deck, the McGrath family only exit from their unit would be by jumping from their second story deck or a second story window.

29. The current owners of the North Building are: Unit 121-Michael and Jill McGrath; Unit 125-Michael Hernandez; Unit 123-Ruthie Palonis; Unit 127-Janet Moran.

30. The current owners of the South Building are: Unit 129-Roy and Kate Plush; Unit 133-George and Angi Konstantinopoulos; Unit 131-Holly and Frank Candella; Unit 135-Mike and Laura Freeman.

31. Units 125-Hernandez and 127-Moran have deck extensions on the North Building. Unit 129-Plush has a deck extension on the South Building.

32. Prior to the construction of the deck extensions, the unit owners of Units 125, 127 and 129 requested the Association to approve their plans for their extensions. The Associations promptly approved their extension plans and supplied the proper paperwork for those projects to begin.

33. None of the owners of Units 125, 127, and 129 were disabled or had disabled occupants of their units at the time of their requests for permission and approval of their deck extensions.

34. Unit 127-Moran, North Building, requested permission from the Association to construct a room additional to her unit. This request was approved by the Association, including a vote by the McGraths in favor, and the Association promptly supplied the proper paperwork for that project to begin.

35. The owner of unit 127 is not disabled and had no disabled occupants at the time of her request for permission and approval for her room addition.

36. Clearly, the Association has no issues with deck extension requests when made by owners/occupants when there are no disabled owners/occupants requesting these deck extensions.

37. Nor has the Association had any issues with deck extensions to back decks, even when no bids or plans are presented to the Association, and no request for approval of the Association for the deck extension. Unit 131-South Building was allowed to extend their back deck, without providing bids, plans or renderings, and the Association never approved this work. The

Association took no action against of the owner of Unit 131 for proceeding with the deck extension without Association approval. The owner/occupant of Unit 131 at the time of the deck extension was not disabled.

38. It is undisputed that all Association members are aware of Tim and Martin's disability, both by interaction with members of the Association as well as multiple correspondence from the McGraths to the entire Association. A few years ago, the McGraths advised the Association of their desire to have an extension and staircase built to the living room deck primarily to provide a secondary exit/entrance to the ground level. The McGraths advised the Association this request was for the safety and wellbeing of their family, specifically Tim and Martin. The McGrath's also stated the extension would help reduce wear and tear of the common area which was the only means for the McGrath family to enter their unit. They also advised the Association it was necessary for the use and enjoyment by their entire family.

39. The McGraths advised they would reach out to contractors and seek some bids. When the McGraths received a favorable bid, they met with the three other owners/occupants of the North Building in a face to face, onsite meeting, to go over the plans for the extension and location of the staircase.

40. The McGraths explained the need to install two (2) 4 x 4's in the common area to provide for the extension, which would be tied into the existing deck, and the staircase would be built on the sand dune side of the deck leading to the ground. The square footage of the proposed deck extension would be less than 100 square feet.

41. At the conclusion of the meeting, the three other unit members, Palonis, Moran, and Hernandez, verbally stated they had no issue with the McGraths' extension plans.

42. In Spring of 2018, the McGraths requested a special Association meeting to present their bid and plans to the entire Association and a vote for its approval. Prior to the meeting, the McGrath's sent the bid and renderings of the extension to every member of the Association.

43. On July 21, 2018, the Special Association meeting was held, beginning outside the McGrath unit so the project could be explained to everyone and any questions regarding the plan could be answered. During this meeting, the McGraths were met with hostility by various members of the Association, including owners/occupants of the North Building (Hernandez and Palonis/Falat) who previously voiced their approval of the same plans.

44. The meeting was continued in Unit 127-Moran's unit, for further discussion. Unfortunately, the McGraths were met with additional hostility, angry statements and comments from a few of the Association members who opposed their plans. This included Hernandez, Palonis/Falat, along with Holly and Frank Candella from the South Building. The Association was read a prior email by Lou Falot which stated the three other owners of the North Building had met with the McGrath's prior to today's meeting and all were in favor of the project. At the conclusion of reading the statement Falot stated the plans submitted and verbally approved at the earlier meeting were now off the table, without giving any explanation as to why.

45. The McGraths were asked to compromise their plans by reducing the extension by two feet and adding a security system, even though no other unit owner had ever been requested to compromise or amend their plans in size or scope, and none had been asked to install a security system. The McGraths said they were willing to do so. The meeting continued to be very hostile towards the McGraths. At this point the McGraths were advised they could not amend the plans as requested by those opposed to their plans, that they would have to be presented at another

meeting. The McGraths then stated they just wanted their original plans to be voted on.

46. Following a Motion and second to approve the plans, the Motion passed by a majority vote of 5-3. (In favor-Plush, Freeman, Konstantinopoulos, Moran and McGrath, Against-Hernandez, Palonis, and Candella) The meeting was then adjourned.

47. The McGraths believe the unit owners who previously voiced their approval of the project, become hostile and then voted against the project, did so based upon the familial status of the McGrath family, specifically having two disabled family members.

48. The following day, July 22, 2018, Janet Moran, who voted in favor of the plans, sent out an email purporting to change her vote from yes to no, despite the fact the meeting had already adjourned. If this change in vote were to count, it would create a 4-4 tie. Upon information and belief, those opposed to the project pressured Moran to try to change her vote.

49. The Association has always advocated adherence to Roberts Rules of Order, which do not allow a person to change their vote after a meeting is adjourned. In the history of the Association, no member has been allowed to change their vote after a meeting has been adjourned.

50. Months later it was discovered that Holly and Frank Candella, Unit 131, who on July 21, 2018 voted against the McGraths' plans, were not the legal owners of unit 131 at the time of the July 21, 2018 vote. This is explained in more detail in Count II, below. As a result of their invalid vote, the true vote on the McGrath project was five (5) in favor and two (2) opposed- Palonis/Falot and Hernandez.

51. Despite having a clear majority vote in favor of the McGrath project, the Association has failed to issue the paperwork necessary for the McGraths to obtain building permits to begin the project, despite repeated requests for the paperwork.

52. Recently, (June 2020) the Association was requested by an Association member to address the McGraths' request for the paperwork for their project.

53. The current officers of the Association are Hernandez, Candella, and Palonis. These Officers of the Association, all of whom voted against the McGrath project, have failed to include or address the issue of issuing the appropriate paperwork to the McGrath's so they may construct the extension to their deck. The Officers of the Association continue to simply ignore the McGraths' request for the paperwork.

## COUNT I

54. In 1968, Congress enacted the Fair Housing Act, prohibiting discrimination on the basis of race, gender, national origin, and religion in the provision of housing. In 1988, through the Fair Housing Amendments Act, Congress extended the law's protections to people with disabilities.

55. One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with disability the equal opportunity to use and enjoy a dwelling.

56. The Act forbids housing providers from discriminating against residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The Association is a "housing provider" under the Act and has treated the McGrath family, Tim and Martin McGrath less favorably then non-disabled owners/occupants within the Association.

57.     The request by the McGrath family for a small deck extension and stairway to the ground, to be paid for by the McGrath family, to provide a reasonable accommodation for a secondary safe way to enter and exit their unit, is not unreasonable and presents no undue hardship or burden upon the Association.

58.     The failure of the Association to provide a prompt response to the McGrath family request for the deck extension with stairs, following a majority favor is support of the project, after additional requests for the proper paperwork, constitutes additional ground in the housing provider to provide a reasonable accommodation.

59.     The McGrath family have been waiting approximately two years for the paperwork and have been harmed by the delay in the Association forwarding the paperwork to start the project.

60.     The change of position of the unit owners who previously voiced their support of the project but changed their position and voted against the project is based upon their discrimination against the McGrath family makeup, specifically the disabled individuals in the McGrath family.

61.     The McGrath family has suffered emotional harm due to the actions of the Association and its members.

   WHEREFORE, Plaintiff s, the McGrath family and individually named Plaintiffs, specifically requests that this Court:

   A. Declare that Defendants' actions constitute illegal disability-based discrimination under the Fair Housing Act;

   B. Declare that on July 21, 2018, the Association approved of the McGrath plans for a deck extension and the Association has violated the FHA by failing to issue the proper paperwork for the McGrath project to begin;

   C. Award actual damages;

   D. Award reasonable attorneys' fees and costs; and

   E. Grant any other relief the Court deems appropriate.

## COUNT II

62. Plaintiff realleges and incorporates paragraphs 1-61 as though fully stated herein.

63. The Indiana Horizontal Property Act, which authorizes Condominium Associations and actions of the Associations, can be found Indiana Code, IC 32-25-1.

64. IC 32-25-9-1, Compliance with articles, bylaws, covenants, etc.; organization of co-owners, Sec.1(a) states each condominium unit owner shall comply with: the articles of incorporation, the bylaws, the administrative rules adopted by the Association.

65. IC 32-25-9-1, Sec.1(b) states, "Failure to comply as required under subsection (a) is grounds for an action: (1) to recover sums due; (2) for damages; (3) for injunctive relief; or (4) for any other legal or equitable relief…….by an aggrieved co-owner.

66. The McGraths are an aggrieved co-owner of the Association due to the unit owners and the Association not complying with the Association Declarations and Bylaws.

67. IC 32-25-2-11, Sec. 11, defines "Co-owner" as meaning a person who owns a condominium in fee simple.

68. In 2014, the legal owner of Unit 131, in the South Building of the Association, was Mary Jo Simonsen.

69. Mary Jo Simonsen was one of the original owners to buy into the Association, with her late husband, Gordon Simonsen, who was an original Officer of the Association, back in the 1980's.

70. Mary Jo Simonsen was provided copies of the Association declarations and bylaws from the date of her purchase of Unit 131, in the 1980's, and was aware of all amendments to the declarations and bylaws through the years.

71. The original Declarations of the Association were recorded in the 1980's, with copies given to all Association members.

72. Paragraph 12 of the Associations original Declaration states, in paragraph 12, "12. Sale, Leasing or other Alteration (a) Any Unit Owner other than the developer who wishes to sell or lease his Unit…….or any interest therein to any person must obtain approval from the Board and shall give to the Board of Directors of the Association (hereinafter referred to as the "Board") not less than thirty (30) days prior written notice of any such sale, lease, assignment or sublease, setting forth in detail the terms of any contemplated sale, lease, assignment or sublease, which notice shall specify the name and address of the proposed purchaser, assignee or lessee and such other information as the Board shall reasonably require."

73. On October 8, 2014, Mary Jo Simonsen entered into an Installment Agreement for Deed with her daughter, Holly Simonsen Candella.

74. Neither Mary Jo Simonsen or Holly Simonsen Candella provided any information of this transaction to the Board of the Association, or any Association member, within 30 days of the Agreement having been executed.

75. The existence of this Agreement was not made known to the Board of the Association and the Association members until the fall 2018/spring 2019 when Holly Simonsen Candella was questioned by Association members about her ownership in the unit.

76. After reviewing county records members of the Association members questioned her ownership of the unit. It was not until the fall/winter of 2019 that she advised the Association that she had entered into a Land Sales Contract with her mother, Mary Jo Simonsen. This was the first time anyone in the Association was made aware of any sales transaction for that unit.

77. The terms of the Agreement were not turned over to the Association until the Association made a demand to see the Agreement, in the Spring of 2019.

78. Pursuant to the terms of the Agreement, transfer of ownership in the unit to Holly Simonsen Candella did not occur until the Spring of 2019, when she made the final payment under the Agreement. Mary Jo Simenson remained the fee simple owner of unit 131 from the date of her purchase in the 1980's through February 2019.

79. Between 2014 and 2018, Holly Simonsen Candella held herself out as the legal owner of unit 131 and attended a majority of the Association semi-annual meetings, along with her husband, Frank Candella.

80. At no time did Holly Candella present a proxy from her mother, Mary Jo Simonsen to attend the meetings or vote as required by the Association's Bylaws.

81. During the meetings held between 2014 and 2018, there was open hostility and inappropriate statements made by Holly Candella and Frank Candella towards other members of the Association, including Michael and Jill McGrath.

82. Michael McGrath questioned the validity of votes made by Holly Candella at Association meetings between the periods of 2014 through 2018. This line of inquiry was met with hostility from the Candellas.

83. Michael McGrath expended time and effort researching legal issues relating to Land Sales Contracts, advised the Association in multiple correspondence, and requested an independent lawyer review and issue a legal opinion as to transfer of ownership when the Association questioned his research.

84. The Association failed to get an independent legal opinion as suggested by McGrath.

85. The hostility from these meetings and correspondence between Mcgrath and the Association, has carried over hostile interactions and correspondence between the Candellas and the McGraths, which has impaired the McGraths' use and enjoyment of their unit.

86. As noted in Count I, the Candellas attended the July 21, 2018 meeting relating to the McGrath deck extension request. The Candellas were outspoken opponents of the request and voted against the request, and added to the hostility, despite that they had no proxy to attend the meeting and where not the legal owners of unit 131, and therefore, should not have been at the meeting.

87. Had Mary Jo Simonsen followed the Association's Declarations by advising the Association of the pending sale of her unit, the Association would have requested Mary Jo Simonsen to attend the meetings or issue a proxy to Holly Simonsen Candella to appear on her behalf.

88. As a result of not following the Association's Declarations, specifically paragraph 12, the McGraths have been subjected to continued hostility from members of the Association and their right to use and enjoyment have been impaired by former owner Mary Jo Simenson, Holly and Frank Candella, and the Board of Directors for failing to make appropriate inquiry as to the lawful ownership of unit 131 for a period of four years.

WHEREFORE, Plaintiff's, the McGrath family and the individually named Plaintiffs, specifically request this that this Court:

A. Declare former owner of unit 131, Mary Jo Simenson failed to comply with the Associations Declarations, Bylaws, rules and regulations;

B. Declare that current owner of unit 131, Holly Simenson Candella failed to comply with the Associations Declarations, Bylaws, rules and regulations;

C. Declare the Association failed to comply with the Associations Declarations, Bylaws, rules and regulations;

D. Declare all votes made by Holly Simenson Candella between 2014 and January 2019 void as she was not the legal owner of unit 131;

E. Award damages;

F. Award reasonable attorneys' fees and costs; and

G. Grant any other relief the Court deems appropriate.

        MICHAEL McGRATH, JILL McGRATH,
TIM McGRATH, MARTIN McGRATH,
COLIN McGRATH, and CM McGRATH

By: _/s/ Michael McGrath_____
     One of their attorneys

Michael J. McGrath
**ODELSON, STERK, MURPHEY,
FRAZIER & McGRATH, LTD.**
3318 West 95th Street
Evergreen Park, IL 60805
708-424-5678
708-424-1898 - Facsimile
ARDC 6229820